AO 241
(Rev. 01/15)

# Petition for Relief From a Conviction or Sentence
## By a Person in State Custody

### (Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus)

### Instructions

1.  To use this form, you must be a person who is currently serving a sentence under a judgment against you in a state court. You are asking for relief from the conviction or the sentence. This form is your petition for relief.

2.  You may also use this form to challenge a state judgment that imposed a sentence to be served in the future, but you must fill in the name of the state where the judgment was entered. If you want to challenge a federal judgment that imposed a sentence to be served in the future, you should file a motion under 28 U.S.C. § 2255 in the federal court that entered the judgment.

3.  Make sure the form is typed or neatly written.

4.  You must tell the truth and sign the form. If you make a false statement of a material fact, you may be prosecuted for perjury.

5.  Answer all the questions. You do not need to cite law. You may submit additional pages if necessary. If you do not fill out the form properly, you will be asked to submit additional or correct information. If you want to submit a brief or arguments, you must submit them in a separate memorandum.

6.  You must pay a fee of $5. If the fee is paid, your petition will be filed. If you cannot pay the fee, you may ask to proceed in forma pauperis (as a poor person). To do that, you must fill out the last page of this form. Also, you must submit a certificate signed by an officer at the institution where you are confined showing the amount of money that the institution is holding for you. If your account exceeds $ _____ , you must pay the filing fee.

7.  In this petition, you may challenge the judgment entered by only one court. If you want to challenge a judgment entered by a different court (either in the same state or in different states), you must file a separate petition.

8.  When you have completed the form, send the original and _____ copies to the Clerk of the United States District Court at this address:

    **Clerk, United States District Court for the District of Massachusetts**
    **1 Courthouse Way, Suite 2300**
    **Boston, MA 02210**

    If you want a file-stamped copy of the petition, you must enclose an additional copy of the petition and ask the court to file-stamp it and return it to you.

9.  **CAUTION: You must include in this petition all the grounds for relief from the conviction or sentence that you challenge. And you must state the facts that support each ground. If you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.**

10. **CAPITAL CASES: If you are under a sentence of death, you are entitled to the assistance of counsel and should request the appointment of counsel.**

AO 241
(Rev. 01/15)

Page 2

## PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF
## HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| United States District Court | District: Massachusetts |
|---|---|

| Name (under which you were convicted): | Docket or Case No.: |
|---|---|
| Jose Tejada | |

| Place of Confinement : | Prisoner No.: |
|---|---|
| MCI-Norfolk, 2 Clark Street, P.O. Box 43, Norfolk MA 02056 | #W105101 |

| Petitioner (include the name under which you were convicted) | | Respondent (authorized person having custody of petitioner) |
|---|---|---|
| Jose Tejada | v. | Nelson Alves, Superintendent and Maura Healey |

| The Attorney General of the State of: Massachusetts |
|---|

## PETITION

1.  (a) Name and location of court that entered the judgment of conviction you are challenging:

    Essex County Superior Court, 56 Federal Street, Salem MA 01970

    (b) Criminal docket or case number (if you know):  1777CR01390 - ## 001, 002, 003

2.  (a) Date of the judgment of conviction (if you know): 08/25/2014

    (b) Date of sentencing:  08/26/2014

3.  Length of sentence:  3 consecutive sentences of life without parole

4.  In this case, were you convicted on more than one count or of more than one crime?  ☑ Yes    ☐ No

5.  Identify all crimes of which you were convicted and sentenced in this case:

    #001 - first degree murder of Milka Rivera, G.L. c. 265, section 1;

    #002 - first degree murder of Sachary Montanez, G.L. c. 265, section 1;

    #003 - first degree murder of Max Ariel Montanez, G.L. c. 265, section 1.

6.  (a) What was your plea? (Check one)

    ☑ (1)   Not guilty          ☐ (3)   Nolo contendere (no contest)

    ☐ (2)   Guilty              ☐ (4)   Insanity plea

(b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did you plead guilty to and what did you plead not guilty to?   N/A

(c) If you went to trial, what kind of trial did you have? (Check one)

☑ Jury     ☐ Judge only

7.  Did you testify at a pretrial hearing, trial, or a post-trial hearing?

☐ Yes   ☑ No

8.  Did you appeal from the judgment of conviction?

☑ Yes   ☐ No

9.  If you did appeal, answer the following:

(a) Name of court:   Supreme Judicial Court of Massachusetts

(b) Docket or case number (if you know):   No. SJC-11951

(c) Result:   Judgements affirmed.  Denial of motion for reconsideration.

(d) Date of result (if you know):   03/16/2020

(e) Citation to the case (if you know):   484 Mass. 1 (2020)

(f) Grounds raised:   see attached sheets

(g) Did you seek further review by a higher state court?   ☐ Yes   ☑ No

If yes, answer the following:

(1) Name of court:

(2) Docket or case number (if you know):

(3) Result:

(4) Date of result (if you know):

Jose Tejada, Petitioner

Petition for Relief From a Conviction or Sentence By a Person in State Custody

(Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus)

Attachment to Page 3

Response to Question 9

9. If you did appeal, answer the following:

. . .

    (f)  Grounds raised: (1) The admission of the defendant's alleged materially inculpatory statements to police while in police custody violated his rights against compelled self-incrimination under the Fifth and Fourteenth Amendments, and under Article 12 of the Massachusetts Declaration of Rights, requiring reversal.  At the time of his questioning by police, Mr. Tejada was "in custody" under Miranda v. Arizona, 384 U.S. 436 (1966), and its progeny.  Mr. Tejada knew he was neither free to leave nor free to direct the police to leave his presence.  Thus, his statements at issue made in response to that questioning should have been suppressed.  A public safety exception to Miranda does not render admissible the statements sought to be suppressed.  The burden of proof as to the establishment of a Miranda violation is to be placed on the government.  (2) The trial judge committed reversible error by refusing to protect Mr. Tejada from potential juror bias against him based on his Hispanic race or ethnicity.  The trial judge refused Tejada's request prior to jury selection that prospective jurors be asked whether they believed that Hispanics in a city such as Lawrence are more likely to commit crimes of violence than other ethnicity or people.  This refusal violated the defendant's rights under the Sixth and Fourteenth Amendments, and under Article 12 of the Massachusetts Declaration of Rights, to a fair trial by an impartial jury; and this refusal violated the defendant's rights to Fourteenth Amendment Equal Protection and to be free from officially sponsored racial discrimination under Fourteenth Amendment due process.  Under U.S. Supreme Court precedent in Ham v. South Carolina, 409 U.S. 524 (1973); Rosales-Lopez v. United States, 451 U.S. 182 (1981); Aldridge v. United States, 283 U.S. 308, 314-315 (1931), it is usually best to allow the defendant to resolve this conflict by making the determination of whether or not he would prefer to have the inquiry into racial or ethnic prejudice pursued, and failure to honor his request, however, will be reversible error only where the circumstances of the case indicate that there is a reasonable possibility that racial or ethnic prejudice might have influenced the jury; and the judge need not defer to the defendant's request where there is no rational possibility of racial prejudice.  As the Massachusetts Supreme Judicial Court has itself recognized a strong basis for the defendant's assertion of the need to examine prospective jurors for potential anti-Hispanic bias, having recognized that in recent years the growing Hispanic and Latino population has encountered varied sources of discrimination, Commonwealth v. Colon, 482 Mass. 162, 179-180 (2019) (citing example cases), as in this case, there was also actual anti-Hispanic bias in this jury pool, and as the alleged facts of this case are disturbing and likely to inflame passions and increase any bias that may have been present, involving the violent deaths of young people and beloved family members, with no rational explanation, a situation likely to upset, inflame the passions, and distort the reasoning of any juror, there was at least a reasonable and rational possibility possibility that racial or ethnic prejudice against the defendant based on his Hispanic status might influence the jury, and the trial judge's refusal to ask the requested

question of prospective jurors was reversible error.  (3)  The evidence raises reasonable doubt as to whether the defendant possessed sufficient mental capacity to form the mental state element required for first or second degree murder, thus his convictions violated the 14th Amendment's Due Process requirement that protects an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.  In re Winship, 397 U.S. 358 (1970).  Proof of criminal responsibility requires proof of both the defendant's substantial capacity to appreciate the wrongfulness of his conduct *and* his substantial capacity to conform his conduct to the requirements of the law.  Tejada's demeanor, appearance, and conduct raised reasonable doubt he possessed such capacity.  (4) Reversal or reduction of the verdicts by the Massachusetts Supreme Judicial Court was appropriate under G. L. c. 278, § 33E, as evidence of intoxication or impaired capacity suggests manslaughter may be more consonant with justice.

AO 241
(Rev. 01/15)

(5) Citation to the case (if you know): _____

(6) Grounds raised: _____

_____

_____

_____

(h) Did you file a petition for certiorari in the United States Supreme Court?   ☑ Yes   ☐ No

If yes, answer the following:

(1) Docket or case number (if you know):   20-5440

(2) Result:   Petition for writ of certiorari to the Supreme Judicial Court of Massachusetts denied.

(3) Date of result (if you know):   10/05/2020

(4) Citation to the case (if you know):   141 S. Ct. 441 (2020)

10.   Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court?   ☐ Yes   ☑ No

11.   If your answer to Question 10 was "Yes," give the following information:

(a)   (1) Name of court: _____

(2) Docket or case number (if you know): _____

(3) Date of filing (if you know): _____

(4) Nature of the proceeding: _____

(5) Grounds raised: _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes   ☐ No

(7) Result: _____

(8) Date of result (if you know): _____

AO 241
(Rev. 01/15)

(b) If you filed any second petition, application, or motion, give the same information:

    (1) Name of court:

    (2) Docket or case number (if you know):

    (3) Date of filing (if you know):

    (4) Nature of the proceeding:

    (5) Grounds raised:

    (6) Did you receive a hearing where evidence was given on your petition, application, or motion?

    ☐ Yes    ☐ No

    (7) Result:

    (8) Date of result (if you know):

(c) If you filed any third petition, application, or motion, give the same information:

    (1) Name of court:

    (2) Docket or case number (if you know):

    (3) Date of filing (if you know):

    (4) Nature of the proceeding:

    (5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

    ❐ Yes    ❐ No

(7) Result: _____

(8) Date of result (if you know): _____

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application,

or motion?

    (1) First petition:    ❐ Yes    ❐ No

    (2) Second petition:    ❐ Yes    ❐ No

    (3) Third petition:    ❐ Yes    ❐ No

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:

_____

_____

12.    For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

    **CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.**

**GROUND ONE:**    see attached sheet
_____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

see attached sheets
_____

_____

_____

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground One, explain why:    N/A

_____

_____

_____

_____

_____

Jose Tejada, Petitioner

Petition for Relief From a Conviction or Sentence By a Person in State Custody

(Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus)

Attachment to Page 6

Response to Question 12, Ground One & Ground One, Section (a)

**GROUND ONE:**

The defendant's rights to a fair trial by an impartial jury under the Sixth and Fourteenth Amendments, and his rights against unlawful discrimination in jury selection under the Fourteenth Amendment's Equal Protection and Due Process clauses, were violated by the trial judge's refusal to ask each prospective juror whether the prospective juror believed that Hispanics, from cities such as Lawrence, are more likely to commit crimes of violence than any other ethnicity or people.

   (a)  Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

         At trial Mr. Tejada requested, by motion, and in open court prior to jury selection, that the judge ask each member of the venire whether the juror believed that "Hispanics, from cities such as Lawrence, are more likely to commit crimes of violence than any other ethnicity [or] people."[1]  Commonwealth v. Tejada, 484 Mass. 1, 12 (2020).[2]  This request was denied.  The trial judge asked prospective jurors,

         Are any of you aware of any bias, prejudice or preconceived notions of any kind that would affect your ability to be a fair and impartial juror in the case?

(Tr. Day 1/36) The trial judge also asked prospective jurors words to the effect of,

         [T]he defendant requires an interpreter. Does this affect your ability to be fair and impartial."[3]

---

[1] The trial judge referenced the defendant's request as, "No. 13 is do you believe that Hispanics in a city such as Lawrence are more likely to commit crimes of violence than other ethnicity or people[?], Tr. Day 1/14 (referencing defendant's Motion for Examination of Jurors, at ¶ 13, which states, "Do you believe that Hispanics, from cities such as Lawrence, are more likely to commit crimes of violence than any other ethnicity or people?").  (R.A.23)

[2] An answer of "yes" to this question would have required the excusal for cause of the prospective juror at issue, and thus would have ensured that the defendant would not have been tried by a jury composed of one or more individuals who harbored an anti-Hispanic bias against him.

[3] See Tr. Day 1/15, 41, 45, 54, 56, 65, 72, 75, 78, 82, 85, 88, 92, 99, 111, 116, 120, 123, 129, 134, 138, 141, 144, 153, 157, 166, 193, 207, 212, 229, 233-234, 235, 239; Tr. Day 2/30, 34, 37, 41, 50, 54, 60-61, 63, 68, 71.

Juror No. 70, Mr. Hindy, answered this question, "I don't think so. I don't know Spanish." Juror No. 70, Mr. Hindy, answered, "I believe so" to the question, "Could you be a fair and impartial juror?" Juror No. 70, Mr. Hindy, was seated in Seat No. 11. (Tr. Day 1/194-197) Juror No. 100, Mr. Brian (phonetic), answered the interpreter question,

> THE JUROR: I work for a lot of people -- a lot of Spanish people come in. The only problem I have is they don't speak English. That is my only problem.
> THE COURT: I don't know. I suspect Mr. Tejada doesn't speak English or he wouldn't have an interpreter. Would that make a difference to you?
> THE JUROR: No. it wouldn't. It's just –
> THE COURT: Okay. But in what respect? Would it play any role?
> THE JUROR: I -- half of my customers are Spanish. They try to talk to me in Spanish. I don't understand.

(Tr. Day 2/28-31) The trial judge excused this juror for cause. (Tr. Day 2/28-32) Juror No. 10, Ms. Steadman, was excused after admitting she had "biases against Spanish-speaking people." (Tr. Day 1/63)

In its decision, the Supreme Judicial Court held that the trial judge was not obligated "to probe ethnic or racial bias by voir dire as a matter of law" because "both the defendant and the victims are Hispanic." Commonwealth v. Tejada, 484 Mass. 1, 12 (2020) (citing and quoting Commonwealth v. Espinal, 482 Mass. 190, 190 (2019)).

Here, there was a reasonable and rational possibility of anti-Hispanic bias in this jury pool.

The SJC has itself recognized, factually, that in recent years "[t]he growing Hispanic and Latino population . . . has encountered varied sources of discrimination." Commonwealth v. Colon, 482 Mass. 162, 179-180 (2019).[4]

There was evidence that bias against Hispanic people was present in this jury pool. Juror No. 10, Ms. Steadman, was excused after acknowledging she had "biases against Spanish-speaking people." (Tr. Day 1/63) Regarding the trial judge's question as to whether the fact that the defendant required an interpreter would affect the ability to be fair and impartial, there were responses containing less than unequivocal expressions of non-bias. Juror No. 19, Mr. Gleeson, answered this question, "No. I don't think so." (Tr. Day 1/77-78) Juror No. 48, Ms. Zujewski, answered this question, "No. I don't think so." (Tr. Day 1/150-154) Juror No. 61, Mr. Muise, answered this question, "I don't believe so" and answered "I think so, yes" to the question, "Could you be a fair and impartial juror?" (Tr. Day 1/177-180) Juror No. 70, Mr. Hindy, answered the interpreter question, "I don't think so. I don't know

---

[4] "More than half of the country's population growth between 2000 and 2010 was attributable to an increase in the Hispanic population. In Massachusetts, an increase in the Hispanic population accounts for the entirety of the State's population growth in that same period. . . . The growing Hispanic and Latino population, in turn, has encountered varied sources of discrimination. See, e.g., Commonwealth v. Buckley, 478 Mass. 861, 878 . . . (2018) (Budd, J., concurring) (Hispanic drivers are stopped more often by police than Caucasian drivers); Bradley v. Lynn, 443 F. Supp. 2d 145, 148 (D. Mass. 2006) (finding disparate and adverse impact on Hispanic candidates for entry-level firefighter positions); Kane v. Winn, 319 F. Supp. 2d 162, 179 (D. Mass. 2004) (citing statistics that Latinos are overrepresented in country's prison population, and 'Latino youths are incarcerated at twice the rate of [Caucasian] American youths')." Colon, supra, 482 Mass. at 179-180 (footnotes omitted).

Spanish." (Tr. Day 1/194-196) Juror No. 70, Mr. Hindy, answered, "I believe so" to the question, "Could you be a fair and impartial juror?" (Tr. Day 1/196) Juror No. 92, Mr. Louis, answered this question, "I'm not sure." (Tr. Day 1/233-234) This juror, Juror No. 92, Mr. Louis, was excused as to that issue. (Tr. Day 1/234) Juror No. 100, Mr. Brian, answered this question,

> I work for a lot of people -- a lot of Spanish people come in. The only problem I have
> is they don't speak English. That is my only problem."

(Tr. Day 2/28-30) The trial judge responded, "I don't know. I suspect Mr. Tejada doesn't speak English or he wouldn't have an interpreter. Would that make a difference to you?" to which the juror responded, "No. it wouldn't. It's just --" to which the trial judge responded, "Okay. But in what respect? Would it play any role?" and the juror responded, "I -- half of my customers are Spanish. They try to talk to me in Spanish. I don't understand." (Tr. Day 2/28-31) Juror No. 100, Mr. Brian, asserted that the fact that the defendant required an interpreter would not cause him to have any bias in this case; the trial judge excused Juror No. 100, Mr. Brian, for cause. (Tr. Day 2/28-32)

Regarding the defendant's requested question at issue, the trial judge stated the following:

> THE COURT: . . . No. 13 is do you believe that Hispanics in a city such as a
> Lawrence are more likely to commit crimes of violence than any other ethnicity or
> people.
>      I don't know as there's any reason to think that people do believe that. And my
> concern is that if you ask a question like that, it may put in the minds of the jurors a
> bias that they might not have. So I would be reluctant to give that.
>      I've asked these kinds of questions before, and I have not found them
> productive, to be frank.

(Tr. Vol. I/14-15) Mr. Tejada objected to the judge's refusal to ask this question. (Tr. Vol. I/14-15)

**Trial.**

Diogenes Luciano testified:

On September 5, 2011, while parking at 6 Diamond Street, a man walked towards him, yelling in Spanish that Luciano needed to take him to the police station because he had just killed 3 people. (Tr. Day 3/8-12) Luciano called the police; officers arrived in 5 to 10 minutes. Luciano asked the man if he had a weapon on him, he said no. The man was sitting on the ground; Luciano told him to sit. Luciano asked him what happened; he told Luciano "that he got tired of it." He said he was tired "[o]f them talking down to him, like he was a nobody." (Tr. Day 3/14-17)[5] The man identified the 3 people as his wife and kids. When asked where this happened, he gave the address of the residence, 15 Maginnis Street. The officers asked the man questions using Luciano to translate: "If he had any weapons on him, what he did with the weapon." He said he threw it away. (Tr. Day 3/17-19) The man

---

[5] Tejada objected to Luciano's testimony as to police asking him to ask Tejada what had happened, to preserve the objections raised in Tejada's motion to suppress statements. The objections were overruled. (Tr. Day 3/17-18)

indicated what he had done by putting his index finger and middle finger up to his head, indicating a gun, and said he shot all 3 of them. He said he tried shooting himself but he ran out of bullets. (Tr. Day 3/26) The man was shaky and didn't talk to Luciano in a normal, conversational tone, he was shaky, the way he was speaking. He was yelling and blubbering, he wasn't calm, it looked like he was possessed, like he might have been on something. His eyes were the size of golf balls. Luciano was concerned because he didn't know if the man was on drugs or if he was drinking. He was talking really fast, almost like he was on drugs. (Tr. Day 3/27-30) While sitting the man was roaming around a little bit; he was looking around nervously; he was shaking still, on the ground. (Tr. Day 3/30-31)

Lawrence Police Det. David Augusta testified:

On September 5, 2011, he was dispatched to the area of 6 Diamond; Laird and Dushame were there, speaking with 2 men in the parking lot, one standing, one sitting. (Tr. Day 3/46-48) Augusta questioned the man sitting on the curb subsequent to Dushame; the man didn't speak English and was talking in Spanish, so Dushame used Luciano to translate. (Tr. Day 3/48-50)

The prosecutor questioned Augusta:

Q  And does Mr. Luciano speak to Sergeant Dushame
   as you're arriving?
A  Yes.
Q  What does he say?
A  He --
           MR. MORRIS: Objection, Judge.

(Tr. Day 3/50) At sidebar, the trial judge stated:

The problem again though is, to the extent that...Mr. Luciano is telling him what the defendant says, that's hearsay.

(Tr. Day 3/51) Defense counsel agreed, and added that the objection was also intended to preserve the defendant's rights as to his denied motion to suppress statements. (Tr. Day 3/52)

Sergeant Dushame testified:

Dushame worked on September 5, 2011, as patrol supervisor. Around 2:00 a.m., he responded to 6 Diamond Street. Luciano and Tejada were there. Laird arrived right behind Dushame. Dushame was unable to talk to the man on the ground (Tejada). Luciano volunteered to translate. Officer Dave Augusta was also there. There were no Spanish speaking officers. Following conversation, Dushame went to 15 Maginnis Avenue, in the Beacon Court projects. Dushame knocked on the front and back doors and got no response from that house. Other officers came 5 or 10 minutes later. (Tr. Day 3/110-117) Dushame determined that he would have to kick the door. Dushame, Laird and Augusta then proceeded into the house. (Tr. Day 3/118-121) As soon as Dushame got to the top of the stairs, he saw blood, and a female lying face first, in a thick puddle of blood, an older female, and on top of them was a young male, facing away, hunched over between the door and bed. (Tr. Day 3/125-127) Dushame located a revolver, a .357, admitted as Exhibit 23, in the backyard that night, in the grass just outside the back door, close to apartment 11. (Tr. Day 3/145-147,158-

160) When Dushame arrived at 6 Diamond Street, at 2:00 a.m., there was a fellow standing and a fellow sitting. (Tr. Day 3/161-162) The person sitting (Tejada) appeared anxious, nervous. (Tr. Day 3/161-163) Dushame was in full uniform: a badge, gun, tool belt, utility belt, handcuffs, pepper spray; it was pretty clear he was a police officer. Tejada didn't try to get up and run away; he stayed there and talked to Dushame. He didn't avoid any questions. Ruffen/Inoa brought Tejada to the station; they found suspected cocaine powder on Tejada. (Tr. Day 3/163-164,167-168)

Officer Ruffen/Inoa testified:

She was bilingual. On September 5, 2011, she was called at 2:00, 2:15 a.m., to assist; she translated between Officers Laird and Augusta, and Tejada, who was seated with them. When she arrived, Dushame was leaving. There were two males, one standing and one sitting. Ruffen/Inoa took over the translation. (Tr. Day 7/182-184) The officers asked Tejada to continue speaking; he was in conversation with a non-police officer (Luciano) when Ruffen/Inoa got there; Tejada started saying, "She-They were yelling at me."[6] With Ruffen/Inoa translating, Tejada said in Spanish, "They were yelling at me." Tejada said,

> They wouldn't shut up, so I pulled out a .357 and I shot them. Then I pointed the gun to my head, pulled the trigger, but there were no bullets left.

(Tr. Day 3/185-186) Tejada picked up his left arm and pointed it to the side of his head. Tejada stated: He left, went for a walk, and on his way out, he threw the gun. (Tr. Day 3/185-188) Possibly Tejada was drunk on alcohol. (Tr. Day 3/189-190)

Rosa Tejada testified:

In 2011, Rosa Tejada, daughter of Jose Tejada, was in contact with Jose Tejada. She knew Milka Rivera, Sachary and Max, and would spend time at Milka's house. On September 4 into September 5, Milka called Rosa, looking for Jose Tejada. Around 1:30, Jose called Rosa and said he was at home. She saw him for about 15 minutes that night; at about 8:30 he came to her house. Rosa had not seen her dad with a gun before she interviewed her. A Spanish-speaking officer asked her whether she had seen her father with a gun; she did not tell him that she had seen him with a gun at Milka's house. When she saw Jose at 8:30 that night for 15 minutes, he looked normal. He called again at 1:30 a.m., was fine, sounded fine. He just wanted to say "bye". (Tr. Day 4/157-163)

Angel Heredia testified: He lived in Lawrence with Milka Rivera's sister, Lourdes Rivera. On September 4, 2011, at Heredia's house, Heredia was sleeping, Jose Tejada called, Lourdes Rivera answered, Jose said he was drinking; she told him to come to Heredia's house, which he did at 9:45 or 10:00. Milka had called, she wanted Heredia and Lourdes to take the keys away from Jose, which they did not do. About 10 minutes later, Milka came and took the keys. She was at the house for about maybe 10 minutes. She asked Tejada for the keys, she told him, "You don't have no papers. You don't have no license and I don't want you driving. You're already here. You're drinking. When you're done, call a cab and go home." (Tr. Day 4/164-170) Tejada called a cab; he left around 11:15. Tejada was not able to

---

[6] Tejada objected and noted that he was preserving the issue raised by way of a prior motion [the motion to suppress statements]. The trial judge overruled Tejada's objection. (Tr. Day 3/184-185)

drive. According to his testimony, Heredia did not think Tejada was drunk and would have let him drive home. When Tejada arrived, he was drinking from a bottle of Hennessy. In about 1 hour and 10 minutes they finished the Hennessy; Heredia testified that he had maybe two shots, and that Tejada drank the rest. Tejada did not have a gun on him. (Tr. Day 4/170-176)

Trooper Glenn Cote of the firearms identification unit testified: that in September 2011, he and Richard Haselton of the ballistics unit examined a .357 magnum Smith & Wesson revolver, Item 2-1, recovered in the rear at 15 Maginnis Avenue; that 6 discharged cartridge casings were recovered from the cylinder of the weapon (Tr. Day 7/3-7,11-17,51); and that based on comparison, they determined that all six discharged cartridge casings were fired by Item 2-1. (Tr. Day 7/26-27) Cote testified: that Item 5-1 was a copper jacket and lead core from Milka Rivera; that they determined Item 5-1 was fired by Item 2-1; that Item 5-3 was a copper jacket and lead core, and four lead fragments, from Max Ariel Montanez; and that they formed the opinion that Item 5-3 was fired by Item 2-1. (Tr. Day 7/50-55)

On September 6, 2011, Dr. Jennifer Hammers, formerly of the state Medical Examiner's Office, performed autopsies on Sachary Montanez and Max Ariel Montanez. (Tr. Day 4/61) Dr. Hammers could not tell exactly how Sachary Montanez and Max Ariel Montanez were shot and could not make an opinion with regard to that. (Tr. Day 4/142-143) Dr. Kimberly Springer testified: she was a medical examiner. (Tr. Day 5/6-7) She conducted an autopsy on Milka Rivera. (Tr. Day 5/10) Dr. Springer could not make any estimate of how far away the firearm was from the entrance wound at the time Milka Rivera was shot. (Tr. Day 5/24) Without knowing where the gun was positioned, Springer could not make a determination on how Milka Rivera was positioned at the time she was shot. (Tr. Day 5/38) Jana Thomas, a civilian with the State Police Crime Laboratory, testified as to her opinion in looking at the physical effects of the hole as well as the chemical nitrite test, as to Milka Rivera's robe, the shot was a contact shot. (Tr. Day 7/94-96,153-155) Jessica Hart of the Crime Lab DNA Unit testified that the DNA profile from a red-brown stain from the barrel, cylinder, trigger and hammer of Item 2-1 indicated a mixture, and that Milka Rivera's DNA profile matched the major female profile in the mixture. (Tr. Day 7/178-180)

During closing argument, the prosecutor stated: "When the police officers arrive, they don't know if this is some crazy person who has just acknowledged having killed people. So they call an ambulance to come. . . ." (Tr. Day 8/34)

In its decision on the defendant's case, the SJC noted

[T]he jury . . .were instructed to consider whether the defendant's intoxication and his mental state would have prevented him from forming the intent to kill. See Commonwealth v. Grey, 399 Mass. 469, 470-471 . . . (1987) (evidence of intoxication and mental impairment relevant to question whether the defendant formed intent to kill); Commonwealth v. Henson, 394 Mass. 584, 592 . . . (1985) (if there is evidence that defendant was under the influence of alcohol or drugs at time of crime, judge should instruct jury to consider that evidence on question whether Commonwealth has proved specific intent beyond reasonable doubt). While there was conflicting evidence as to the defendant's condition, the jury were free to weigh that evidence as they saw fit.

Commonwealth v. Tejada, supra, 484 Mass. at 6 (footnote omitted).

(c)   **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?   ☑ Yes   ☐ No

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐ Yes   ☑ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion or petition?                   ☐ Yes   ☐ No

(4) Did you appeal from the denial of your motion or petition?               ☐ Yes   ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   ☐ Yes   ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

_____

AO 241
(Rev. 01/15)

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have

used to exhaust your state remedies on Ground One: _____

_____

_____

**GROUND TWO:**        see attached sheet _____

_____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

see attached sheets _____

_____

_____

_____

_____

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground Two, explain why: _____

_____

_____

(c)     **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?     ☑ Yes     ☐ No

(2) If you did <u>not</u> raise this issue in your direct appeal, explain why: _____

_____

(d)     **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

    ☐ Yes     ☑ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Jose Tejada, Petitioner

Petition for Relief From a Conviction or Sentence By a Person in State Custody

(Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus)

Attachment to Page 8

Response to Question 12, Ground Two & Ground Two, Section (a)

**GROUND TWO:**

The defendant's rights against compelled self-incrimination under the Fifth and Fourteenth Amendments were violated by the admission at trial of the defendant's materially inculpatory statements made to police in response to police interrogation at the scene of the defendant's arrest without police having first provided the defendant with his Miranda rights,[1] where there was never a chance from the first moment of the defendant's encounter with police that the police would have permitted the defendant to leave the scene and where the defendant was arrested during that encounter between the defendant and the police.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Motion to Suppress Statements

On September 5, 2011, around 2:00 a.m., Jose Tejada, with blood on his jeans and on his hands, was found by four Lawrence police officers, sitting on a curb at Beacon and Diamond Street in Lawrence. The officers had responded to a report that someone had confessed a murder. The police officers, Sergeant John Dushame, Officer Alan Laird, Officer David Augusta, and, Ariskelda Ruffen (subsequently, Ariskelda Inoa) questioned Mr. Tejada repeatedly, first through a civilian, Diogenes Luciano, and subsequently through Ruffen/Inoa, who acted as unofficial, untrained interpreters and translators.

Tejada was not read his Miranda rights until after he had been brought to the police station. Mr. Tejada made numerous incriminating statements to the police in response to police questioning, during which the lead police officer, Sergeant Dushame, admitted that Mr. Tejada had not been free to leave. If Tejada had tried to get up off the curb, Dushame would not have allowed him to get up. (9/11/2013 Hrg./91-93,97,98)

The defendant filed a motion to suppress statements which, after an evidentiary hearing, was allowed as to statements made while the defendant was seated, handcuffed in

---

[1] See Miranda v. Arizona, 384 U.S. 436 (1966). Under Miranda, supra, the admissibility in evidence of any statement given during custodial interrogation of a suspect depends on whether the police provided the suspect with four warnings. These warnings (which have come to be known colloquially as "*Miranda* rights") are: a suspect "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." Dickerson v. United States, 530 U.S. 428, 435 (2000) (quoting Miranda, 384 U.S. at 479).

the police cruiser, and was otherwise denied. Memo and Order, at 3 (A.12; R.A.38); (Tr. Day 1/7)

Police Officer Ariskelda Ruffen[2] heard a report that someone had confessed to a murder and was called to Beacon and Diamond Street; at that location, 2 Hispanic males were present, and, in uniform, Lawrence Police Sergeant John Dushame, and Officers Alan Laird and David Augusta. (8/29/2013 Hrg./6-10,73; 9/11/2013 Hrg./98) Tejada said in Spanish, "they kept yelling at me, and they wouldn't shut up." (8/29/2013 Hrg./10-11) Tejada was just a little out of it. Ruffen, not a trained interpreter, acted as a translator. (8/29/2013 Hrg./12-15,42) She did not Mirandize[3] Tejada. She was standing next to Diogenes Luciano,[4] who had been interpreting. Tejada was sitting right in front of Ruffen, next to Laird, then Augusta, then Sergeant Dushame. Augusta was standing behind Laird, and next to Augusta was Dushame. There was a semi-circle in front of Tejada; if he wanted to get up and walk away, he would have had to go through at least four police officers, and he would have had to get past Ruffen. Ruffen testified both that, "He wasn't in custody." and that "If he wanted to get up and go, that would be the primary officer's decision." (8/29/2013 Hrg./12-15,50-58) Only Tejada was sitting; there were 4 or 5 people standing in front of him. As a responding officer, Ruffen had no authority over whether Tejada could leave. (8/29/2013 Hrg./12-15,54-60) At Dushame's request, Ruffen asked Tejada where he lived, he said 15 Maginnis. She asked Tejada to direct her there, whether he would go with her, he said yes. Laird had checked Tejada for weapons, patted him down and placed handcuffs on him. Laird put him in the back of Ruffen's cruiser. Ruffen traveled to 15 Maginnis. Tejada spoke about having shot his girlfriend. (8/29/2013 Hrg./18,22-26) When Ruffen took over the questioning, she did not Mirandize Tejada, had not heard him Mirandized, and had not asked whether he had been Mirandized. She gave him Miranda rights in Spanish at the station. (8/29/2013 Hrg./32,50-54)

Lawrence Police Officer Alan Laird testified:

On September 5, 2011, during the 1:00 a.m. to 9:00 a.m. shift, Laird received a call as to someone confessing to a man about a possible death; he went to Diamond Springs Apartments. Dushame and Augusta also arrived. Laird spoke to Luciano, who told Laird this man had approached him and said to call the police because he had killed someone. A Spanish-speaking male, Tejada, was sitting on a curb, Laird was speaking in English, and Luciano was purportedly translating it. (8/29/2013 Hrg./73-74; 9/11/2013 Hrg./4-8,11-12) When Laird asked the man who he killed, Luciano said, "It's his family." Laird asked where it was that he killed his family, and Luciano said 15 Maginnis. Laird asked how people were killed by him, and he made with his hand "a gesture of a gun, and he put it to his head." They

---

[2] This witness changed her last name from Ruffen to Inoa. Tr. Day 3/181-182. ("Ruffen or Ruffen/Inoa").
[3] See Miranda v. Arizona, 384 U.S. 436 (1966). Under Miranda, supra, the admissibility in evidence of any statement given during custodial interrogation of a suspect depends on whether the police provided the suspect with four warnings. These warnings (which have come to be known colloquially as "Miranda rights") are: a suspect "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." Dickerson v. United States, 530 U.S. 428, 435 (2000) (quoting Miranda, 384 U.S. at 479).
[4] Incorrectly, "Luciano Diogenes" in 9/11/2013 Hrg. See, e.g., id. at 7,14.

asked Tejada questions about the location of the weapon, and "he said he threw it, he had thrown it." (9/11/2013 Hrg./10,12-13)

There was blood on Tejada's jeans and on his hands. They pat frisked him, to make sure he didn't have any weapons. He was then handcuffed and put in Ruffen's cruiser. Ruffen took him to 15 Maginnis. Once it was identified that this was the house, they started banging on the door, and they eventually made entry. Laird, Dushame, and Officers Michaud and Augusta went in. Inside they saw a large amount of blood; 3 people were deceased. (9/11/2013 Hrg./16-23)

At Diamond Street, prior to asking Tejada questions, Laird did not Mirandize him. When Laird pat frisked him, he was in custody, he was not free to leave. He was still on the curb after Laird pat frisked him and put him back on the curb. Sergeant Dushame and Officer Augusta were there. Laird asked him how he killed his family, and he responded. Laird asked him who he killed, and he responded. Laird asked him where, Laird asked him how, he told Laird, with a gun. Laird asked him where the gun was and he told Laird he threw it away. Laird and Ruffen/Inoa asked the suspect where he threw the handgun, that was after he went in the house and saw the bodies on the floor; Laird continued to ask him questions after Laird left the house. (9/11/2013 Hrg./27-37,40-43,53-55)

Sergeant John Dushame testified:

In the evening of September 5, 2011, Dushame heard by radio that someone had confessed to killing someone, and went to 6 Diamond Street in South Lawrence. There he saw one man standing, Luciano, and one man on the curbing. Luciano said the man sitting, Tejada, approached him and told him he just killed some people. Luciano stated "he doesn't have the weapon anymore. He threw it away." (9/11/2013 Hrg./55-57,62-63) Dushame was in charge at the scene; he asked Tejada what happened and Tejada indicated he did not speak English; he spoke Spanish. Luciano said he would translate. Luciano said Tejada said something like, "I had enough, I would I killed them." (9/11/2013 Hrg./63-64) Tejada was disoriented and sweating, there appeared to be bloodstains on his shorts, droplets of blood. Dushame drove to 15 Maginnis Avenue, knocked and banged on the door and received no reply; with him were Laird, Augusta, and Officer Michaud; the door was kicked in. Dushame located the firearm, a revolver, in the back of the house using his flashlight. (9/11/2013 Hrg./68-72,74)

As Dushame originally approached the Diamond Street scene, Tejada was sitting on the curb, to Dushame's left, and the interpreter, Luciano, was standing to Dushame's right. There was a semi-circle around Tejada, who was the only one sitting. Dushame was in full uniform, wearing a gun. Laird and Augusta were in full uniform. Luciano told Dushame some people were killed and the gun that was used to kill them was thrown away, and Dushame saw blood on Tejada's shorts. That fellow with blood on his pants was not free to go at that point;[5] he was going to be held there while Dushame continued his investigation. Then Dushame asked Tejada, "[W]here did this happen?" and Tejada answered him and Dushame went to that scene. Before Dushame asked that question, he did not Mirandize Tejada; nobody Mirandized Tejada. (9/11/2013 Hrg./83-87,89-90)

---

[5] Dushame: "I wasn't going to let him go, no." (9/11/2013 Hrg./89)

Dushame asked that Tejada be brought to 15 Maginnis Avenue, where Tejada did not get out of the car. Ruffen/Inoa asked him, "[I]s this the place?" It was confirmed as the address. Before Tejada was asked this he was not Mirandized. Tejada was not free to leave in the police car. (9/11/2013 Hrg./91-93) Clearly Tejada was not free to leave if somebody had just told Dushame he had killed somebody. If Tejada had tried to get up off the curb, Dushame would not have allowed him to get up. (9/11/2013 Hrg./91-93,97-98)

Lawrence Police Officer David Augusta testified:

On September 5, 2011, Augusta was a patrol officer, working the 1:00 a.m. to 9:00 a.m. shift. He heard a call and was sent to the parking lot of 6 Diamond Street as backup. When Augusta got to the Diamond Street scene, Laird, Dushame, and two Hispanic men were there. In the driveway to that parking lot there was a man, Tejada, sitting on a concrete barrier, a Spanish gentleman, Laird and Dushame. Tejada said he had shot someone, they asked where, he gave an address, they asked how many, he said, "all of them; my wife and children"; they asked with what, he said with a gun. They asked him how many times, he said, "I emptied the gun. There was no more bullets in it." (9/11/2013 Hrg./98-103) When Tejada said that he had shot people at 15 Maginnis, Augusta asked him, "[W]here did you shoot them?" He mentioned "in the bedrooms". Knowing how the apartments were laid out, Augusta said, "upstairs in the bedroom, you know, the bedroom top back". "He said, upstairs in the third bedroom to the left." This was before Dushame had gone to 15 Maginnis. When Augusta arrived at the Diamond Street scene, Laird and Dushame were out of the car. They were standing at the concrete barrier. They were within five feet to the left of the person. Augusta was 3 to 5 feet away and had a gun. The interpreter was at the left. The officers were to the right. Augusta was to the rear. Tejada had blood on his pants. At 15 Maginnis, more questioning went on. Before that second question, Augusta did not hear the fellow on the curb being Mirandized by anybody and did not Mirandize him. Dushame left at some point, he went to 15 Maginnis. Augusta stayed at the scene with Laird. Ruffen/Inoa arrived to help translate. Augusta didn't know if Luciano was speaking truthful to him, because Augusta didn't speak Spanish. (9/11/2013 Hrg./101-115,124-127)

This fellow on the ground, Tejada, wasn't free to go anywhere because Augusta was investigating a crime, and they were certainly not going to let him leave without finding out for sure. Augusta had not Mirandized him at that point; nobody else had Mirandized him. Augusta knew he didn't speak English, and continued to ask him questions. Augusta asked him who he killed and he answered that question; then Augusta asked him where. The first question was who he killed. The second question was where, he told Augusta, and Dushame went to the address he gave. He told Augusta he had done it with a gun. Tejada had not been pat frisked. Augusta asked him where the gun was. He said he threw it but did not recall where. There appeared to be "blood splatter" on his shorts. Augusta asked him what the spots were and he said probably blood. Then Augusta asked, from the shooting? And he responded, yes, and Augusta asked him where in the apartment did he shoot the victim, and he answered, "Upstairs." Augusta asked him, How many times did he shoot. At that point Augusta had asked him about 10 or 11 questions without the benefit of Miranda. Augusta did not Mirandize him. Dushame did not tell anyone to Mirandize him. Tejada was never Mirandized in Augusta's presence. (9/11/2013 Hrg./131-138)

**Trial.**

Diogenes Luciano testified:

On September 5, 2011, while parking at 6 Diamond Street, a man walked towards him, yelling in Spanish that Luciano needed to take him to the police station because he had just killed 3 people. (Tr. Day 3/8-12) Luciano called the police; officers arrived in 5 to 10 minutes. Luciano asked the man if he had a weapon on him, he said no. The man was sitting on the ground; Luciano told him to sit. Luciano asked him what happened; he told Luciano "that he got tired of it." He said he was tired "[o]f them talking down to him, like he was a nobody." (Tr. Day 3/14-17)[6] The man identified the 3 people as his wife and kids. When asked where this happened, he gave the address of the residence, 15 Maginnis Street. The officers asked the man questions using Luciano to translate: "If he had any weapons on him, what he did with the weapon." He said he threw it away. (Tr. Day 3/17-19) The man indicated what he had done by putting his index finger and middle finger up to his head, indicating a gun, and said he shot all 3 of them. He said he tried shooting himself but he ran out of bullets. (Tr. Day 3/26) The man was shaky and didn't talk to Luciano in a normal, conversational tone, he was shaky, the way he was speaking. He was yelling and blubbering, he wasn't calm, it looked like he was possessed, like he might have been on something. His eyes were the size of golf balls. Luciano was concerned because he didn't know if the man was on drugs or if he was drinking. He was talking really fast, almost like he was on drugs. (Tr. Day 3/27-30) While sitting the man was roaming around a little bit; he was looking around nervously; he was shaking still, on the ground. (Tr. Day 3/30-31)

Lawrence Police Det. David Augusta testified:

On September 5, 2011, he was dispatched to the area of 6 Diamond; Laird and Dushame were there, speaking with 2 men in the parking lot, one standing, one sitting. (Tr. Day 3/46-48) Augusta questioned the man sitting on the curb subsequent to Dushame; the man didn't speak English and was talking in Spanish, so Dushame used Luciano to translate. (Tr. Day 3/48-50)

The prosecutor questioned Augusta:

Q   And does Mr. Luciano speak to Sergeant Dushame
    as you're arriving?
A   Yes.
Q   What does he say?
A   He --
            MR. MORRIS: Objection, Judge.

(Tr. Day 3/50) At sidebar, the trial judge stated:

The problem again though is, to the extent that...Mr. Luciano is telling him what the defendant says, that's hearsay.

(Tr. Day 3/51) Defense counsel agreed, and added that the objection was also intended to preserve the defendant's rights as to his denied motion to suppress statements. (Tr. Day 3/52)

---

[6] Tejada objected to Luciano's testimony as to police asking him to ask Tejada what had happened, to preserve the objections raised in Tejada's motion to suppress statements. The objections were overruled. (Tr. Day 3/17-18)

Sergeant Dushame testified:

Dushame worked on September 5, 2011, as patrol supervisor. Around 2:00 a.m., he responded to 6 Diamond Street. Luciano and Tejada were there. Laird arrived right behind Dushame. Dushame was unable to talk to the man on the ground (Tejada). Luciano volunteered to translate. Officer Dave Augusta was also there. There were no Spanish speaking officers. Following conversation, Dushame went to 15 Maginnis Avenue, in the Beacon Court projects. Dushame knocked on the front and back doors and got no response from that house. Other officers came 5 or 10 minutes later. (Tr. Day 3/110-117) Dushame determined that he would have to kick the door. Dushame, Laird and Augusta then proceeded into the house. (Tr. Day 3/118-121) As soon as Dushame got to the top of the stairs, he saw blood, and a female lying face first, in a thick puddle of blood, an older female, and on top of them was a young male, facing away, hunched over between the door and bed. (Tr. Day 3/125-127) Dushame located a revolver, a .357, admitted as Exhibit 23, in the backyard that night, in the grass just outside the back door, close to apartment 11. (Tr. Day 3/145-147,158-160) When Dushame arrived at 6 Diamond Street, at 2:00 a.m., there was a fellow standing and a fellow sitting. (Tr. Day 3/161-162) The person sitting (Tejada) appeared anxious, nervous. (Tr. Day 3/161-163) Dushame was in full uniform: a badge, gun, tool belt, utility belt, handcuffs, pepper spray; it was pretty clear he was a police officer. Tejada didn't try to get up and run away; he stayed there and talked to Dushame. He didn't avoid any questions. Ruffen/Inoa brought Tejada to the station; they found suspected cocaine powder on Tejada. (Tr. Day 3/163-164,167-168)

Officer Ruffen/Inoa testified:

She was bilingual. On September 5, 2011, she was called at 2:00, 2:15 a.m., to assist; she translated between Officers Laird and Augusta, and Tejada, who was seated with them. When she arrived, Dushame was leaving. There were two males, one standing and one sitting. (Tr. Day 7/182-184) The officers asked Tejada to continue speaking; he was in conversation with a non-police officer (Luciano) when Ruffen/Inoa got there; Tejada started saying, "She-They were yelling at me."[7] With Ruffen/Inoa translating, Tejada said in Spanish, "They were yelling at me." Tejada said,

> They wouldn't shut up, so I pulled out a .357 and I shot them. Then I pointed the gun to my head, pulled the trigger, but there were no bullets left.

(Tr. Day 3/185-186) Tejada picked up his left arm and pointed it to the side of his head. Tejada stated: He left, went for a walk, and on his way out, he threw the gun. (Tr. Day 3/185-188) Possibly Tejada was drunk on alcohol. (Tr. Day 3/189-190)

Rosa Tejada testified:

In 2011, Rosa Tejada, daughter of Jose Tejada, was in contact with Jose Tejada. She knew Milka Rivera, Sachary and Max, and would spend time at Milka's house. On September 4 into September 5, Milka called Rosa, looking for Jose Tejada. Around 1:30, Jose called Rosa and said he was at home. She saw him for about 15 minutes that night; at about

---

[7] Tejada objected and noted that he was preserving the issue raised by way of a prior motion [the motion to suppress statements]. The trial judge overruled Tejada's objection. (Tr. Day 3/184-185)

8:30 he came to her house. Rosa had not seen her dad with a gun before the police interviewed her. A Spanish-speaking officer asked her whether she had seen her father with a gun; she did not tell him that she had seen him with a gun at Milka's house. When she saw Jose at 8:30 that night for 15 minutes, he looked normal. He called again at 1:30 a.m., was fine, sounded fine. He just wanted to say "bye". (Tr. Day 4/157-163)

Angel Heredia testified: He lived in Lawrence with Milka Rivera's sister, Lourdes Rivera. On September 4, 2011, at Heredia's house, Heredia was sleeping, Jose Tejada called, Lourdes Rivera answered, Jose said he was drinking; she told him to come to Heredia's house, which he did at 9:45 or 10:00. Milka had called, she wanted Heredia and Lourdes to take the keys away from Jose, which they did not do. About 10 minutes later, Milka came and took the keys. She was at the house for about maybe 10 minutes. She asked Tejada for the keys, she told him, "You don't have no papers. You don't have no license and I don't want you driving. You're already here. You're drinking. When you're done, call a cab and go home." (Tr. Day 4/164-170) Tejada called a cab; he left around 11:15. Tejada was not able to drive. According to his testimony, Heredia did not think Tejada was drunk and would have let him drive home. When Tejada arrived, he was drinking from a bottle of Hennessy. In about 1 hour and 10 minutes they finished the Hennessy; Heredia testified that he had maybe two shots, and that Tejada drank the rest. Tejada did not have a gun on him. (Tr. Day 4/170-176)

Trooper Glenn Cote of the firearms identification unit testified: that in September 2011, he and Richard Haselton of the ballistics unit examined a .357 magnum Smith & Wesson revolver, Item 2-1, recovered in the rear at 15 Maginnis Avenue; that 6 discharged cartridge casings were recovered from the cylinder of the weapon (Tr. Day 7/3-7,11-17,51); and that based on comparison, they determined that all six discharged cartridge casings were fired by Item 2-1. (Tr. Day 7/26-27) Cote testified: that Item 5-1 was a copper jacket and lead core from Milka Rivera; that they determined Item 5-1 was fired by Item 2-1; that Item 5-3 was a copper jacket and lead core, and four lead fragments, from Max Ariel Montanez; and that they formed the opinion that Item 5-3 was fired by Item 2-1. (Tr. Day 7/50-55)

On September 6, 2011, Dr. Jennifer Hammers, formerly of the state Medical Examiner's Office, performed autopsies on Sachary Montanez and Max Ariel Montanez. (Tr. Day 4/61) Dr. Hammers could not tell exactly how Sachary Montanez and Max Ariel Montanez were shot and could not make an opinion with regard to that. (Tr. Day 4/142-143) Dr. Kimberly Springer testified: she was a medical examiner. (Tr. Day 5/6-7) She conducted an autopsy on Milka Rivera. (Tr. Day 5/10) Dr. Springer could not make any estimate of how far away the firearm was from the entrance wound at the time Milka Rivera was shot. (Tr. Day 5/24) Without knowing where the gun was positioned, Springer could not make a determination on how Milka Rivera was positioned at the time she was shot. (Tr. Day 5/38) Jana Thomas, a civilian with the State Police Crime Laboratory, testified as to her opinion in looking at the physical effects of the hole as well as the chemical nitrite test, as to Milka Rivera's robe, the shot was a contact shot. (Tr. Day 7/94-96,153-155) Jessica Hart of the Crime Lab DNA Unit testified that the DNA profile from a red-brown stain from the barrel, cylinder, trigger and hammer of Item 2-1 indicated a mixture, and that Milka Rivera's DNA profile matched the major female profile in the mixture. (Tr. Day 7/178-180)

During closing argument, the prosecutor stated: "When the police officers arrive, they don't know if this is some crazy person who has just acknowledged having killed people. So they call an ambulance to come. . . ." (Tr. Day 8/34)

In its decision on the defendant's case, the SJC noted

[T]he jury . . .were instructed to consider whether the defendant's intoxication and his mental state would have prevented him from forming the intent to kill. See Commonwealth v. Grey, 399 Mass. 469, 470-471 . . . (1987) (evidence of intoxication and mental impairment relevant to question whether the defendant formed intent to kill); Commonwealth v. Henson, 394 Mass. 584, 592 . . . (1985) (if there is evidence that defendant was under the influence of alcohol or drugs at time of crime, judge should instruct jury to consider that evidence on question whether Commonwealth has proved specific intent beyond reasonable doubt).  While there was conflicting evidence as to the defendant's condition, the jury were free to weigh that evidence as they saw fit.

Commonwealth v. Tejada, supra, 484 Mass. at 6 (footnote omitted).

AO 241
(Rev. 01/15)

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion or petition?                    ❏  Yes        ❏  No

(4) Did you appeal from the denial of your motion or petition?               ❏  Yes        ❏  No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   ❏  Yes   ❏  No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

_____

(e)     **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Two :  _____

_____

_____

_____

**GROUND THREE:**            N/A

_____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

_____

_____

_____

_____

_____

_____

AO 241
(Rev. 01/15)

(b) If you did not exhaust your state remedies on Ground Three, explain why: _____

_____

_____

_____

_____

(c) **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue? ☐ Yes ☐ No

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐ Yes ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

(3) Did you receive a hearing on your motion or petition? ☐ Yes ☐ No

(4) Did you appeal from the denial of your motion or petition? ☐ Yes ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? ☐ Yes ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

(e)   **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Three: _____

_____

_____

**GROUND FOUR:**   N/A   _____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

_____

_____

_____

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground Four, explain why: _____

_____

_____

(c)   **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?      ❒  Yes      ❒  No

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(d)   **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

❒  Yes      ❒  No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion or petition?           ☐ Yes      ☐ No

(4) Did you appeal from the denial of your motion or petition?      ☐ Yes      ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?   ☐ Yes      ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e)   **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Four:

13.  Please answer these additional questions about the petition you are filing:

    (a)  Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction?  ☑ Yes  ☐ No

        If your answer is "No," state which grounds have not been so presented and give your reason(s) for not presenting them:

    (b)  Is there any ground in this petition that has not been presented in some state or federal court?  If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

        No.

14.  Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction that you challenge in this petition?  ☑ Yes  ☐ No

    If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the issues raised, the date of the court's decision, and the result for each petition, application, or motion filed.  Attach a copy of any court opinion or order, if available.  see attached sheet

15.  Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for the judgment you are challenging?  ☐ Yes  ☑ No

    If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised.

Jose Tejada, Petitioner

Petition for Relief From a Conviction or Sentence By a Person in State Custody

(Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus)

Attachment to Page 13

Response to Question 14

14.

. . . .

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the issues raised, the date of the court's decision, and the result for each petition, application, or motion filed.  Attach a copy of any court opinion or order, if available.

U.S. Supreme Court, 1 First Street, NE, Washington, DC 20543.  Petition for writ of certiorari denied on October 5, 2020.  Issues:

    1.   Whether the right to a fair trial by an impartial jury under the Sixth and Fourteenth Amendments requires a trial judge, during jury selection and upon a criminal defendant's request, to ask each prospective juror whether the juror believed that Hispanic persons from cities such as Lawrence, Massachusetts (the city where the alleged offenses were located), are more likely to commit crimes of violence than any other ethnicity or people.

    2.   Whether the Equal Protection Clause of the Fourteenth Amendment requires a trial judge, during jury selection and upon a criminal defendant's request, to ask each prospective juror whether the juror believed that Hispanic persons from cities such as Lawrence, Massachusetts (the city where the alleged offenses were located), are more likely to commit crimes of violence than any other ethnicity or people.

    3.   Whether the Due Process Clause of the Fourteenth Amendment requires a trial judge, during jury selection and upon a criminal defendant's request, to ask each prospective juror whether the juror believed that Hispanic persons from cities such as Lawrence, Massachusetts (the city where the trial and alleged offenses were located), are more likely to commit crimes of violence than any other ethnicity or people.

    4.   Whether a suspect's rights against compelled self-incrimination under the Fifth and Fourteenth Amendments require the suppression of statements made in response to police interrogation where the suspect's arrest was imminent, where the police admitted that the suspect would not have been permitted to leave the scene of the interrogation and where the statements at issue pertained to material aspects of the jury's decision.

AO 241
(Rev. 01/15)

16.     Give the name and address, if you know, of each attorney who represented you in the following stages of the
        judgment you are challenging:

        (a) At preliminary hearing:     N/A

        (b) At arraignment and plea:     John P. Morris, 60 Washington Street, Suite 201, Salem MA 01970.

        (c) At trial:     (same as (b))

        (d) At sentencing:     (same as (b) and (c))

        (e) On appeal:     David H. Mirsky, Mirsky & Petito, Attorneys at Law, P.O. Box 1063, Exeter NH 03833.

        (f) In any post-conviction proceeding:     (same as (e))

        (g) On appeal from any ruling against you in a post-conviction proceeding:

        (same as (f))

17.     Do you have any future sentence to serve after you complete the sentence for the judgment that you are
        challenging?          ☐ Yes     ☑ No

        (a) If so, give name and location of court that imposed the other sentence you will serve in the future:

        (b) Give the date the other sentence was imposed:

        (c) Give the length of the other sentence:

        (d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the
        future?          ☐ Yes     ☐ No

18.     TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain
        why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.*

        The petition is timely filed under 28 U.S.C. section 2241(d)(1)(A) because it is being filed within 1 year

        after October 5, 2020, which is the date on which petitioner's petition for writ of certiorari was denied

        (and therefore the date on which the judgments became final by the conclusion of direct review).

AO 241
(Rev. 01/15)

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in part that:

    (1)    A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody  pursuant to the judgment of a State court.  The limitation period shall run from the latest of -

        (A)    the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

        (B)    the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

        (C)    the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

        (D)    the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

AO 241
(Rev. 01/15)

(2)     The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Therefore, petitioner asks that the Court grant the following relief:     Reverse his convictions and grant him a new trial

_____

_____

or any other relief to which petitioner may be entitled.

_____
Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on _____ (month, date, year).

Executed (signed) on     9/9/21     (date).

_____
Signature of Petitioner

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition.

_____

_____

_____

_____